Filed 5/21/14  In re Jade C. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re JADE C. et al., Persons Coming Under the Juvenile Court Law. | B249976 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DI. C., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK68415) |

APPEAL from an order of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Di. C. (mother) appeals from a juvenile court order terminating her parental rights to her eight-year-old daughter Jade and seven-year-old son Anthony pursuant to Welfare and Institutions Code[1] section 366.26. We conclude the juvenile court's findings on each of the disputed issues were supported by substantial evidence and, therefore, affirm.

**FACTS AND PROCEDURAL BACKGROUND**

Because resolution of this appeal turns upon the existence of substantial evidence supporting the juvenile court's order, we state the facts in the manner most favorable to the court's determination, resolving all evidentiary conflicts in favor of the court's findings. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576; *In re N. S.* (2002) 97 Cal.App.4th 167, 172.)

1.      *Initial Detention*

Mother has eight children: Eduardo (born August 1994), D. L. (born August 1995), Destiny (born September 1997), Matthew (born February 2000), Jewel (born December 2001), Jade (born June 2005), Anthony (born July 2006), and De. (born November 2011). This appeal concerns only Jade and Anthony.

On June 6, 2007, the Los Angeles County Department of Children and Family Services (the Department) received a referral, alleging mother had been leaving the children in motels overnight and physically abused D. D. also reported that mother had punched the other children when she was upset. Mother admitted she had a substance abuse problem, but failed to enroll in treatment.

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

On June 12, 2007, the Department filed a dependency petition on behalf of the children, based on the alleged physical abuse, neglect, mother's substance abuse problems and the respective fathers' failure to provide for their children. The juvenile court detained the children, with custody vested in the Department, after a hearing the same day.

At the detention hearing, mother indicated that Jewel and Jade may have Indian heritage through their paternal grandmother. When questioned by the court, the paternal grandmother reported she was half Cherokee and could supply an enrollment number. Mother also stated she had Indian heritage, but her tribe was not federally recognized. The juvenile court noted the Indian Child Welfare Act (ICWA) might apply based on the paternal grandmother's claimed Cherokee heritage and asked that she supply her enrollment number to the Department. The court found ICWA did not apply to mother's claimed Indian ancestry.

2.      *Initial Disposition and Reunification*

Following detention, Jade and Anthony were placed together in a foster home, Eduardo was placed with his maternal aunt, and the remaining children were placed in a different foster home. Jewel was subsequently moved to the foster home Jade and Anthony shared.

On October 16, 2007, the juvenile court sustained the petition, declared the children dependents of the court, and found no reasonable means existed to protect the children without removing them from mother's physical custody. The court ordered reunification services for mother, including counseling, substance abuse treatment, drug testing, and parenting classes.

On March 12, 2008, mother graduated from her rehabilitation program. The Department also reported that mother had maintained consistent contact with the children through weekly telephone calls and monitored visits. On March 25, 2008, the juvenile court liberalized mother's contact with the children to unmonitored visits, and granted the Department discretion to liberalize the visits further.

3

On September 23, 2008, the Department reported mother had obtained full-time employment and was approved for low-income housing. She continued to visit the children on a weekly basis and wanted them returned to her custody. The children were doing well in their respective placements, but also wished to return to mother's custody.

On November 21, 2008, the juvenile court granted the Department discretion to return the children to mother's custody. The same month, the Department returned the children to mother's custody, under continued supervision.

3. *Subsequent Detention*

On October 27, 2009, the Department received a report that four-year-old Jade and three-year-old Anthony had been found wondering the apartment complex alone and partially naked. The reporting party observed the children were "very dirty and they had gum stuck in their hair." She stated mother regularly left the older siblings to watch the younger children, who were often unsupervised. The apartment management also had received several complaints in the preceding months regarding noise in mother's apartment and the children vandalizing the premises.

On November 10, 2009, the Department re-detained the children, after finding mother's apartment in a filthy and unsanitary condition. The Department reported the carpet throughout the entire apartment was stained black with dirt, clothes were littered in every room, the windows in each bedroom were open without screens, rotting food was found on the kitchen table and in some of the bedrooms, there were holes in the walls and bedroom doors, the toilets were clogged and there was feces on the wall. When asked why there were no screens on the bedroom windows, the children reported that they regularly jumped out of the windows, sometimes placing a mattress below the second-floor window to break their fall.

After the detention, Jewel and Jade were placed in one foster home, Matthew and Anthony were placed in another, D. and Destiny were placed together, and Eduardo was placed in a separate foster home.

4

4. *Contact and Visitation Following Re-Detention*

In the months following detention, mother failed to maintain regular contact with the children. Matthew's and Anthony's caregiver reported that mother called to speak with Matthew only once. Jewel's and Jade's caregiver reported mother had not called to speak to the girls. Mother missed a scheduled visit with her children in December 2009, but did not contact the foster family agency or caregivers to reschedule.

On February 22, 2010, mother was arrested for possession of methamphetamine. Thereafter, mother missed 16 drug testing appointments and never submitted to an on-demand drug test. Mother was enrolled in an outpatient drug-treatment program, where she had three negative drug tests, but she was ultimately discharged from the program after missing 14 sessions. Due to her failure to complete two consecutive negative drug tests, mother's visitation with the children continued to be monitored.

In September 2010, Jewel, Jade and Anthony were re-placed in the home of a family friend. Since their most recent detention, mother had visited the children only six times. Mother also failed to maintain regular contact with the assigned social worker and, on several occasions, had berated the social worker in profane outbursts.

By November 2010, Jewel, Jade and Anthony had been moved to another foster home. Eduardo and Matthew were placed together, as were D. and Destiny. The Department reported the siblings continued to have regular visits with one another.

Mother's visits with the children were less frequent. With respect to Jade and Anthony, mother had visited the children only once in the last month, even though she had been given the opportunity to visit them on a weekly basis.

On November 2, 2010, the juvenile court terminated mother's family reunification services and set a section 366.26 hearing for all seven children.

5.	*Contact and Visitation Following Placement with Prospective Adoptive Parents*

On December 18, 2010, Jewel, Jade and Anthony were placed in the home of the prospective adoptive parents.  By January 2011, the Department reported the children were adjusting well to their new home.

In December 2010, mother had an inappropriate outburst during a visit with the children.  The Department reported mother screamed hurtful and profane things at the children about their fathers and relatives, and made demeaning and threatening remarks about the children's caregivers.  Mother also reportedly called D. a profane name, after which she told the child, " 'Don't ever come visit me again!' "  The visit was terminated early due to the hostile environment created by mother's outburst.

On February 16, 2011, mother again had an inappropriate and profanity-laced outburst during a visit with the children.  The children's caretakers also reported numerous incidents in which mother had threatened them, including during in person confrontations and through threatening text and voicemail messages.  Based on the reports, the juvenile court restricted mother's visitation to monitored visits, once every two weeks, for 90 minutes per visit, at the Department's office.

On August 16, 2011, the Department reported that Jewel, Jade and Anthony had been with the prospective adoptive parents for eight months and were bonded to their caregivers.  Jewel stated she felt good about being adopted and loved them "like a mom and dad."  Anthony and Jade also said they wanted to be adopted and loved their foster parents.  The foster parents reported they wanted to adopt the children.  They also were willing to assist the children in maintaining contact with their older siblings after the adoption.

In advance of the section 366.26 hearing, the Department provided a detailed report of mother's visits with the children since May 2011. Mother attended each of the bi-monthly visits, but was often 20 to 30 minutes late. During one of the visits, the Department reported mother's mood repeatedly switched from happy to angry, and she complained to the children that the Department "ruined" their family. The siblings interacted with each other during the visits and generally enjoyed the time together.

On November 1, 2011, mother gave birth to De. The court continued the section 366.26 hearing to December 14, 2011.

6. *Jewel's Placement in a New Foster Home*

During their placement with the prospective adoptive parents, a children's therapist noted that Jewel sometimes acted aggressively toward Jade. The children's foster mother also reported that Jewel had been acting out over the past year, often after visits with mother, and berated Jade on an almost daily basis. Nevertheless, the foster parents remained committed to adopting Jade, Anthony and Jewel, and the children's therapist believed the placement was appropriate.

However, in November 2011, Jewel reported that she had changed her mind and no longer wanted to be adopted. She claimed she never wanted to be adopted, but also did not want to be separated from Jade and Anthony. The prospective adoptive parents were saddened by Jewel's change of heart, as they had hoped to adopt all three children.

On December 14, 2011, the juvenile court continued the section 366.26 hearing and ordered the Department to look into whether Jewel could be placed with Destiny. Jewel was subsequently placed in a new foster home, separate from her other siblings.

7. *The Juvenile Court Finds ICWA Does Not Apply*

On July 11, 2012, the Department reported on its investigation of mother's claim that Jewel and Jade may have Indian heritage through their paternal grandmother. The Department reported that the paternal grandmother had provided a letter attesting to her enrollment in the Fernandeño Tataviam Band of Mission Indians. A letter from the Department of the Interior also confirmed the paternal grandmother's enrollment in the tribe. The children's father also wrote a letter to the Department confirming his

7

membership in the Fernandeño Tataviam Band of Mission Indians. The Department provided notices to the Fernandeño Tataviam Band of Mission Indians with information regarding the family; however, because the tribe is not federally recognized, the Department maintained that ICWA did not apply.

On December 11, 2012, the juvenile court found the ICWA did not apply. The paternal grandmother filed a notice of appeal from the court's ICWA determination, with which she included her tribal roll number and a letter from the Fernandeño Tataviam Band of Mission Indians, confirming her enrollment in the tribe. Her notice of appeal did not mention her initial claim of Cherokee heritage.

8. *Contact and Visitation in Advance of Section 366.26 Hearing*

After numerous continuances, the section 366.26 hearing finally was set for April 9, 2013. In advance of the hearing, the Department submitted several status reports concerning mother's visits with the children. The reports indicated mother often was late and had missed more than five of the bi-monthly visits with her children since January 2012. Mother's interactions with the children were generally appropriate, but not all visits were without incident. At times the older siblings argued or misbehaved. Mother was unable to control them and blamed the older children for the family being separated. At another visit, mother told D. that she would be to blame if the family did not reunify.

Jade's and Anthony's prospective adoptive mother also expressed concerns about mother's visits with the children. Jade reportedly told her foster mother that mother had instructed her to be "bad and mean to her foster mom, just like Jewel before she was replaced." The foster mother was very concerned because she had been committed to adopting Jewel before Jewel changed her mind about the adoption. She worried that mother was coaching Jade to follow in Jewel's footsteps, and did not want to lose Jade like she lost Jewel.

In late-2012, the prospective adoptive parents reported that Jade and Anthony no longer enjoyed the visits with mother and their siblings. Prior to each visit, the children reportedly asked " 'Do I have to go?' " Neither mother nor any of the siblings had called Jade or Anthony on their birthdays.

9.    *Motion for De Facto Parent Status and Post Adoption Agreement*

On September 6, 2012, the prospective adoptive parents filed a motion for judicial determination of de facto parent status as to Jade and Anthony. The foster parents included a copy of a post adoption agreement with their motion, wherein they agreed to allow visits between Jade, Anthony and their siblings at least four times a year, and phone contact with the siblings once a month. The siblings and their respective attorneys and caretakers executed the agreement.

On October 4, 2012, the juvenile court granted the prospective adoptive parent's motion for de facto parent status as to Jade and Anthony.

10.    *Section 366.26 Hearing and Order*

On April 9 and 11, 2013, the juvenile court held a section 366.26 hearing regarding severance of parental rights as to Jade and Anthony and the permanent plan for adoption. D. and Destiny both testified in opposition to the adoption. D. testified that she had a "strong relationship" with Anthony and Jade, and did not "want them to think that we just left them." Destiny testified she that feared losing "touch with them," and she was concerned Jade and Anthony were "getting spoiled" in the prospective adoptive parents' home. The parties stipulated that if Jewel were to testify, she also would oppose the adoption.

Mother's counsel argued the court should apply the parent and sibling beneficial relationship exceptions and that legal guardianship was a more appropriate plan. The Department argued Jade and Anthony were entitled to permanency without further delay, and the post adoption agreement ensured the children would be able to maintain contact with their siblings. Counsel for Jade and Anthony both joined the Department in asking the court to terminate parental rights.

9

The juvenile court found Jade and Anthony were adoptable and that neither exception to the statutory preference for adoption applied. Accordingly, the court terminated parental rights and released Jade and Anthony for adoption. Mother appealed.

## DISCUSSION

1. *Substantial Evidence Supports the Juvenile Court's Order Terminating Mother's Parental Rights*

    a. *Standard of review*

A section 366.26 hearing proceeds on the premise that the efforts to reunify the parents and child are over, "and the focus of the hearing is on the long-term plan for care and custody." (*In re Jasmine J.* (1996) 46 Cal.App.4th 1802, 1808.) As a general rule, "[t]he court must . . . terminate parental rights if clear and convincing evidence shows that it is likely that the minor will be adopted." (*Ibid*.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

We review a juvenile court's order terminating parental rights under the substantial evidence standard. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576; but see *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351 [concluding the abuse of discretion standard applies to determination regarding the type of custody that is appropriate, but recognizing "[t]he practical differences between the two standards of review are not significant"]; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*) [holding "both standards of review come into play"; substantial evidence applies to findings concerning the existence of a beneficial relationship, while abuse of discretion applies to determination whether the existence of that relationship constitutes a compelling reason for determining termination of parental rights would be detrimental].)

Here, substantial evidence supports the juvenile court's findings and determinations regarding the termination of parental rights and adoption for Jade and Anthony.[2]

>   b.      *The parent beneficial relationship exception*

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the statutory preference for adoption where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The exception applies only if the benefit from maintaining the parental relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (*Id.*, subd. (c)(1)(B).)

"In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. . . . [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. . . .  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)  "[I]t is the parent's burden to show exceptional circumstances exist." (*Id.* at p. 574.)

---

[2]      We would reach the same conclusion under both the abuse of discretion standard and the hybrid approach adopted by the *Bailey J.* court.  On this record, the evidence was more than sufficient to support any discretionary determinations made by the juvenile court.

11

Jade and Anthony have been in foster care for almost two-thirds of their young lives. When they were initially detained in 2007, Jade was just under two years old and Anthony was only 10 months. Over the next year, mother maintained regular visits and successfully reunified with the children. However, just a year later, when Jade and Anthony were four and three years old respectively, the children were again detained from mother's custody. Mother failed to reunify with the children and they have been in foster care ever since.

Mother's visitation with the children after their re-detention was not consistent. Mother missed several visits—including more than five after her visits were reduced to just two per month—and she was tardy for the majority of the visits that she did attend. Though mother's conduct was generally appropriate, the record discloses numerous instances in which she was unable to manage the children's needs and behavior during the brief visits, and mother continued to blame the older children for the family's separation. There also was evidence that mother coached Jewel to disrespect her foster parents, which likely contributed to Jewel being separated from her younger siblings. And there was evidence that mother attempted to influence Jade to follow in Jewel's footsteps.

Mother contends there is "an abundance of evidence in the underlying record that Jade and Anthony thoroughly enjoyed their regular visitation time with Mother." But there also is evidence that, by late-2012, Jade and Anthony no longer enjoyed the visits and questioned whether they had to go. In any event, even if most visits were positive, that still would not be enough to displace the juvenile court's findings on this record. To overcome the preference for adoption, "the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the

12

natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Jade and Anthony are entitled to the permanency that the Legislature has determined will, in most cases, be in the best interests of a child. The record amply supports the juvenile court's determination that any benefit Jade and Anthony might derive from continuing the parental relationship with mother would not outweigh the well-being these children will gain in a permanent home with adoptive parents.

      c.     *The sibling beneficial relationship exception*

Similar to the parent beneficial relationship exception, section 366.26, subdivision (c)(1)(B)(v) provides an exception to the statutory preference for adoption where "the juvenile court determines that there is a 'compelling reason' for concluding that the termination of parental rights would be 'detrimental' to the child due to 'substantial interference' with a sibling relationship." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) "Furthermore, the language focuses exclusively on the benefits and burdens to the adoptive child, not the other siblings." (*In re Daniel H.*, at p. 813.)

"[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R., supra,* 31 Cal.4th at p. 61.) In doing so, the juvenile court is directed to consider "the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

13

To be sure, there is evidence that Jade and Anthony had a loving relationship with their siblings. Nevertheless, the evidence pertinent to the considerations mandated by the statute amply supports the juvenile court's determination that a "compelling reason" was not established, and adoption remained in children's best interests.

For instance, the record shows that Jade and Anthony shared a home with their older siblings for only about three years, part of which was interrupted by their initial detention in 2007. In fact, apart from the time they lived with Jewel before she changed her mind about adoption, Jade and Anthony never shared a home with their siblings after their re-detention in 2009. In short, Jade and Anthony spent the majority of their young lives apart from their siblings. They were not raised in the same home.

Moreover, in view of the siblings' time living apart and the children's disparate ages, the juvenile court also could find that Jade and Anthony did not share common experiences or have a strong bond with their older siblings. At the time of the section 366.26 hearing, Eduardo was 18 years old, D. was 17, Destiny was 15, and Matthew was 12, while Jade and Anthony were 7 and 6 years old respectively. Though there was evidence of loving relationship between Jade and her sisters, the visitation reports mostly document interactions between the older siblings, while Jewel, Jade and Anthony played separately among themselves. Further, though Jade and Anthony shared a foster home with Jewel, there also is evidence of a rift between 11-year-old Jewel and her younger siblings. For instance, while Jewel was in their home, the prospective adoptive parents reported that she acted aggressively toward Jade and berated her younger sister on an almost daily basis. Although they had hoped to adopt all three children, the prospective adoptive parents acknowledged that, after Jewel was moved to a different foster home, Jade and Anthony seemed happier without the " 'Jewel' drama."

Finally, though D. and Destiny each expressed understandable concern about their younger siblings forgetting them, the evidence supports the juvenile court's finding that ongoing contact between the siblings was likely to continue after the adoption. From the time Jade and Anthony were first placed in their home, the prospective adoptive parents showed a commitment to allowing the children to maintain regular contact with their siblings. Indeed, the prospective adoptive parents executed a post-adoption agreement, wherein they pledged to facilitate a minimum of four annual visits between the children and their older siblings. Based on this evidence, the juvenile court reasonably concluded the adoption would not result in a detrimental or substantial interference with the sibling relationship.

2.      *Substantial Evidence Supports the Juvenile Court's ICWA Finding*

Mother contends the juvenile court erred by not requiring the Department to serve notice to the Cherokee tribes pursuant to ICWA. We conclude the court's ICWA finding was supported by the evidence.

"Under ICWA, a party seeking foster care or termination of parental rights must notify an Indian child's tribe of the pending proceedings and of its right to intervene." (*In re J.D.* (2010) 189 Cal.App.4th 118, 123.) The statute applies to federally recognized tribes only. (25 U.S.C. § 1903(8); *In re K.P.* (2009) 175 Cal.App.4th 1, 5.) ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner . . . ." (25 U.S.C. § 1912(a).) "ICWA does not require inquiry where no evidence of Indian ancestry is presented." (*In re J.D.,* at p. 123.)

In 2007, the state legislature enacted section 224 in accordance with ICWA. Section 224.3, subdivision (c) provides: "If the court [or] social worker . . . knows or has reason to know that an Indian child is involved, the social worker . . . is required to make further inquiry regarding the possible Indian status of the child . . . by interviewing the parents, Indian custodian, and extended family members . . . , contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member or eligible for membership in and contacting the tribes and any other person that reasonably can be expected to have information regarding the child's membership status or eligibility."

"When it is shown that the court or department knew or had reason to know the child was an Indian child but failed to make an inquiry, we remand with instructions to ensure compliance with ICWA . . . ." (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467.) "However, both the federal regulations and the California Welfare and Institutions Code require more than a bare suggestion that a child might be an Indian child." (*In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520.) "We review a court's ICWA findings for substantial evidence." (*In re Hunter W.,* at p. 1467.)

Mother acknowledges that the Fernandeño Tataviam Band of Mission Indians is not federally recognized and, therefore, ICWA was not triggered by the paternal grandmother's membership in the tribe. Nevertheless, mother argues the Department was required to give notice to the Cherokee tribes based on the paternal grandmother's statement at the initial detention hearing that she was 50 percent Cherokee. We disagree.

When questioned by the juvenile court at the detention hearing, the paternal grandmother affirmed she could supply an enrollment number for the Cherokee tribe through which she claimed Indian heritage. Thereafter, she provided a letter from the Fernandeño Tataviam Band of Mission Indians, which included her enrollment number and attested to her status as a "tribal citizen of the Fernandeño Tataviam Band of Mission Indians." The Department of Interior likewise confirmed the paternal grandmother's enrollment in the tribe, and Jade's father wrote a letter to the Department also attesting to

16

his membership in the Fernandeño Tataviam Band of Mission Indians. The record discloses no further mention of Cherokee heritage after the paternal grandmother was asked to supply her enrollment number. Indeed, in her notice of appeal from the court's ICWA determination, the paternal grandmother again claimed Indian heritage through only the Fernandeño Tataviam Band of Mission Indians—not a Cherokee tribe.

Contrary to her initial claim of Cherokee heritage, the paternal grandmother's subsequent admissions credibly establish that she is a member of a non-federally recognized tribe only. The evidence was sufficient to sustain the juvenile court's finding that ICWA did not apply. (See *In re Jeremiah G., supra,* 172 Cal.App.4th at p. 1521 [juvenile court properly proceeded without ICWA notice after father retracted claim that great-grandfather may have been Indian].)

**DISPOSITION**

The juvenile court's order terminating mother's parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:



KLEIN, P. J.



CROSKEY, J.